**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**
**CASE NO. 4:11-cv-44-RLY-DML**

RIPPEY et al.                                                          **PLAINTIFFS**

v.

**FIRST AMENDED COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

DEATRICK, et al.                                                      **DEFENDANTS**

## INTRODUCTION

Plaintiffs all bring this case for the wrongful and tragic death of Crystal Thompson on September 9, 2010, while in pre-trial custody of the Harrison County Sherriff's Office. The above-named Defendants, individually, in their Official Capacities, by and through their agents, representatives, ostensible agents and/or employees, acted with a deliberate indifference to the life, health and safety of Crystal Thompson. The Defendants allowed Crystal to slowly die in cell #1222 of the Harrison County Jail, on video, despite numerous warning signs of severe physical distress and while in custody for charges of shoplifting items worth approximately $70 from Wal-Mart. Crystal left behind three minor children aged five, four and one years old. Plaintiffs' First Amended Complaint adds Dr. Al-Shami individually as a Defendant.

## JURISDICTION AND VENUE

1.     Plaintiffs seek damages from Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for gross and unconscionable violations of the rights, privileges and immunities guaranteed Crystal by the Fourth, Fifth, Sixth, Eighth, Tenth and Fourteenth Amendments to the

United States Constitution.  Accordingly, this Court has jurisdiction of this case pursuant to 38 U.S.C. §§ 1331 and 1343.

2.      Plaintiffs also seek damages from Defendants for common law negligence arising from the same operative facts and claims as the claims asserted under § 1983.  Accordingly, this Court has jurisdiction over the parties and claims pursuant to 38 U.S.C. § 1367.

3.      The actions or failures to act giving rise to this Complaint occurred in the Southern District of Indiana.  Accordingly, this Court is the proper venue for this action.

## PARTIES

4.      Plaintiff Johanna Rippey is the Court-appointed Guardian over the property for Crystal's three surviving minor children M.T., T.T., and A.M.  The three surviving children currently reside with their grandparents within the Southern District of Indiana.

5.      Plaintiff The Estate of Crystal Thompson, through its Court-appointed personal representative, Crystal's mother Charlotte Bryant, is an Estate under the administration of the Washington County (Indiana) Circuit Court.

6.      Defendant Mike Deatrick was at all times relevant to this Complaint the Sheriff of Harrison County, employed by the Harrison County Sheriff's Office.  Individually and his official capacity, he was responsible for the supervision, training, hiring, firing, conduct and management of the below-named individual Harrison County Sheriff's Office officers, employees, deputies and representatives.  Deatrick was responsible for the establishment of policies (either formally or by custom) in the Harrison County Jail and for the treatment of inmates or detainees of the Harrison County Sheriff's Office.

2

7.     Defendants Harrison County Sheriff's Office and Harrison County Government are political subdivisions of the State of Indiana, and at all times mentioned herein, were responsible for the establishment of policies (either formally or by custom) in the Harrison County Jail and for the treatment of inmates or detainees of the Harrison County Sheriff's Office, as well as employed and was responsible for the supervision, training, hiring, firing, conduct and management of the below-named individual Harrison County Sheriff's Office officers, employees, deputies and representatives and contracted with the below-named Advanced Correctional Healthcare, Inc.

8.     Defendant Rodney "Rod" Seelye is currently the Sheriff of Harrison County, employed by the Harrison County Sheriff's Office, and is legally responsible in his individual and official capacity for any and all judgments entered against current and/or former employees, officers, representatives, deputies, agents or ostensible agents.

9.     Defendant Advanced Correctional Healthcare, Inc., ("Advanced") is an Illinois-based company operating in and doing business in the Southern District of Indiana.  Advanced provides medical services through a contract with the Harrison County Sheriff's Office and/or Harrison County Government, by and through its employees, agents, ostensible agents and representatives, including, but not limited to, Nadir Al-Shami, M.D.

10.     Defendant Nadir Al-Shami, M.D. ("Dr. Al-Shami"), is, upon information and belief, a citizen and/or resident of Kentucky who is licensed to practice medicine and actually does practice medicine in the Southern District of Indiana.  At all times relevant to this Complaint, Dr. Al-Shami was an employee, representative, agent and/or ostensible agent of Advanced.

11.     Defendants James Mabon, Andrew Morton, Sheila Fluhr, Ross Timberlake, Matthew Puckett, Gerald Leon Price, Jennifer Morton, Nathan Wayne Banet, Chris Walden, Jason Harrell, Nathan Simpson, Patricia Loretta Laswell and Christel Scholtz were at all times relevant to this Complaint employees, deputies, officers, representatives, agents and/or ostensible agents of the Harrison County Sheriff's Office and acted in their individual and/or Official Capacities, and as such were responsible for the supervision, training, hiring, firing, conduct and management of the officers and/or employees and/or agents and/or contractors of the Harrison County Jail. These Defendants were responsible for the establishment of and carrying out policies (either formally or by custom) in the Harrison County Jail and for the treatment of inmates or detainees of the Harrison County Sheriff's Office, specifically including Crystal Thompson.

### FACTS AND DEFENDANTS' CONDUCT

12.     Defendants, individually and in concert with one another, engaged in the conduct described below under color of law of the State of Indiana, Harrison County and Indiana common law. The individual and corporate Defendants knowingly participated in, acquiesced in, contributed to, encouraged, implicitly or explicitly authorized or approved the conduct described below in their individual and/or official capacities with the Harrison County Sheriff's office or as a contractor for the Harrison County Sheriff's Office. The actions and claims described below resulted from the failure of the named individuals with supervisory responsibilities to employ qualified persons for positions of authority, and/or to properly or conscientiously train and supervise the conduct of such persons after their employment, and/or to promulgate or follow appropriate operating policies and procedures either formally or by custom to protect the constitutional rights of Crystal Thompson. Defendants' conduct was intentional

and grossly negligent, indicated a deliberate and reckless disregard for and indifference to the life, safety and health, and to the constitutionally-granted and common law rights of Crystal Thompson, and justifies an award of punitive damages in addition to the compensatory damages and attorneys' fees entitled under law.

13.     On September 9, 2010, at approximately 12:45 P.M., Crystal Thompson was arrested by Defendant Chris Walden at the Wal-Mart on SR 135 in Harrison County for shoplifting three DVDs, socks, spoons, baby wipes and baby bottles totaling $77.  She had no previous criminal record or history.

14.     Walden transported Thompson to the Harrison County Jail ("the jail") in his patrol vehicle.  While being transported, Thompson showed signs of drowsiness and actually fell asleep or passed out.

15.     Upon arriving at the jail, Walden, Defendant Jennifer Morton ("Ms. Morton") and Defendant Gerald Leon Price took an inventory of Crystal's purse and person and found a small blue pill.  Walden and Price consulted the Physician's Desk Reference and determined that the pill was a Xanax.  Because they had consulted the PDR and Xanax is a well-known prescription drug, Defendants Price and Walden had specific knowledge that one of the primary side effects of Xanax is drowsiness.

16.     While she was in custody, Walden questioned the suspect regarding the pill, and she denied having taken any Xanax.  Crystal told Walden that a friend had given her the pill for her nerves but she had not taken it and forgotten it was in her purse.

17.     Walden then informed Crystal that he was going to have the pill verified by the pharmacy, that it was illegal to posses someone else's medication and that he may charge her with a crime for possessing the pill.  At this point, Thompson was the suspect of a crime or

illegal activity and it was communicated to Thompson that she was suspected of illegal activity or a crime and could be charged with additional crimes.

18.     Thompson was not apprised of her right to remain silent or her right to an attorney before being interrogated or questioned about drugs, and was not given access to an attorney during this period despite repeated questioning about whether she had taken or was under the influence of narcotics.

19.     Ms. Morton also found among Crystal's possession a cigarette wrapper that had a light white power residue on it and a straw.  The items were checked for meth, but tested negative.

20.     While she was in custody, Price noted that Crystal was acting and/or talking in a strange manger and observed her falling asleep at the book-in counter.  Price questioned her multiple times about whether she had taken or was under the influence of drug, which she denied.  During the admission paperwork Price was completing, Thompson fell asleep again.  Price told Defendant Banet, who clapped his hands to wake her up.

21.     Price again questioned Thompson about whether she was under the influence of or had taken any drugs and she again said no.  She told Price that she had not been sleeping well because she had been taking care of her young children.

22.     Defendant Harrell was also in the booking area when Thompson was there and also asked Thompson if she was under the influence of or had taken drugs.

23.     Harrell referred Thompson to the Medical Officer, Defendant Mabon.  As Medical Officer, Mabon had authority over other jail staff members, made and implemented policies regarding the medical care of inmates, detainees and prisoners at the jail, trained and directed other jail staff members regarding medical treatment of inmates, detainees and prisoners

at the jail and acted as the official Harrison County Jail representative, contact and/or supervisor over Defendant Advanced Correctional Healthcare, Inc.

24.     Mabon questioned Thompson in the booking area.  He asked her if she had taken any narcotics, to which she replied that she had taken an over the counter sleep aid and that she had children at home and had not slept.

25.     Mabon told Harrell to place Thompson on 24 hour "Medical Watch," (also referred to as "med watch") a written policy and/or widespread custom and/or deliberate act of a Harrison County decision-maker by which the individual's person or body is to be checked and documented.  Under questioning by a state police investigator, multiple Defendants described the policy and procedures required for a person on "med watch" differently, evidencing a lack of training or supervision of employees.

26.     Price allowed Thompson to use the telephone, and while she was on the telephone, she fell asleep again.  Price overheard Thompson tell Harrell that she had not slept well because of her children.

27.     Thompson was put into her cell, cell #1222, at approximately 2:15 PM.

28.     Price believed that Thompson was placed on "Medical Observation," a written policy and/or widespread custom requiring that jail staff check on the person every fifteen minutes to one hour, depending on the severity, that was less serious than "med watch." According to Price, a check on Medical Observation required a jail staff member to verbally awaken the person through an opening in the cell door.

29.     Close to 4 PM, the end of the first shift, Price is notified by Defendant Laswell that Thompson has not moved and he should check on her.  Price went to the door of the cell, yelled at Thompson but did not get a response.

30.     While he was going to get the keys to the cell, Ms. Morton banged on the door to the cell, causing Thompson to awake, stretch and sit on the bunk.  Thompson then asked to use the phone again.

31.     While using the pay phone, Thompson again fell asleep.  Thompson was then taken back to her cell.

32.     Price's shift ended at 4 PM.  He did not "pass on" any information about Thompson or write, log, note or otherwise put any information about Thompson in the "pass on" book.

33.     At 4 PM, a new group began their shift at the jail, including Mr. Morton, the Second Shift Supervisor, Defendant Sheila Fluhr, Defendant Ross Timberlake, Defendant Christel Scholtz and Defendant Matthew Puckett.

34.     Fluhr is supposed to receive medical "pass on" information and Mr. Morton is supposed to receive important information needed to run the night shift as "pass on" information.  Neither received any "pass on" information about Thompson.

35.     Mr. Morton was not aware of any policy requiring officers to check cells at the beginning of their shifts.  Mr. Morton was not aware of any policies requiring regular, hourly checks of cells during a shift.  Under Mr. Morton's supervision, the frequency of cell checks depended on the day and staffing levels.

36.     During the shift for which Mr. Morton was supervisor, no Harrison County Jail employee, staff member or officer performed any walk-through or cell checks.

37.     While Fluhr received no "pass on" information, she overheard that Thompson fell asleep while talking on the phone, overheard that Thompson said she took a sleeping aid and

overheard Banet and Simpson say that Thompson was found with Xanax.  Mr. Morton also overheard that Thompson fell asleep while on the phone on first shift.

38.     At approximately 4:40 PM, another inmate who is distributing meals noticed that Thompson was sitting on her bunk with her head between her knees and that she was snoring extremely loud in approximately 5-10 second intervals.  The inmate knocked on Thompson's door to get her attention but did not wake her.  The inmate notified Fluhr.

39.     At approximately 5:11 PM, more than 30 minutes after being notified, Fluhr for the first time entered Thompson's cell and, with Mr. Morton's assistance, examined Thompson, leaned her over into a laying down position and lifted her legs onto the bed.

40.     Fluhr had no medical training, was not CPR-certified and had limited ability to take pulse and blood pressure.

41.     Fluhr tapped Thompson's shoulder multiple times, but she did not wake up.

42.     Fluhr yelled at Thompson to wake up, but she did not wake up.

43.     Fluhr and Mr. Morton rubbed Thompson's sternum, but she did not wake up.

44.     Fluhr and Mr. Morton used an ammonia swab under Thompson's nose, but she did not wake up.

45.     Fluhr and Mr. Morton call Mabon, who told them that Thompson had taken a sleeping aid the night before.

46.     Fluhr was unable to check Thompson's vital signs, such as blood pressure, but Mr. Morton checked her pulse and said it was "fine."

47.     Fluhr lifted Thompson's arm and it dropped down.  Fluhr lifted Thompson's leg and it flopped right down.  Thompson did not wake up.

48.     Fluhr opened Thompson's eyelids easily, but she saw no pupil and only saw the whites of Thompson's eyes.  Thompson did not wake up.

49.     Fluhr called Dr. Nadir Al-Shami, the on-call physician, who was an employee, agent, representative and/or ostensible agent of Defendant Advanced.

50.     Fluhr communicates all of the information in Paragraphs 42-47, above, to Dr. Al-Shami.  Dr. Al-Shami, knowing that information and only that information, diagnosed that Thompson was likely "acting up somehow" and advised Fluhr to leave her alone for awhile, check her in a couple hours and call him back.

51.     This call and activity in Thompson's cell lasted until approximately 5:28.

52.     No one entered Thompson's cell again until approximately 8:57 PM.

53.     From 5:28 until approximately 8:57 PM, Thompson laid virtually motionless.

54.     From 5:28 until approximately 8:57 PM, Thompson's cell was recorded and visible by video, monitored by Timberlake, Puckett and Fluhr.

55.     At approximately 6:48 PM, Puckett noticed the way Thompson was laying in her cell was "off" – he could not see her move, could not see whether she was breathing and noticed her arms were not moving.  Puckett had Timberlake call Mr. Morton, who observed Thompson from outside the cell but did not go in.

56.     From 5:28 until approximately 8:57 PM, there are no walk-through or cell checks performed, including of Thompson's cell.

57.     At approximately 7:30 PM, Timberlake noticed that Thompson had not moved in awhile, and notified Mr. Morton.  Mr. Morton again went to the door and observed Thompson, but did not enter the cell.

58.     At approximately 7:45 PM, Fluhr took over the main control area to give Timberlake a break.  When Puckett came in to relieve her, she told Puckett to keep an eye on Thompson.

59.     At approximately 8:00 PM, Fluhr tells Mr. Morton she has checked Thompson out and determined that she was "fine."  Fluhr did not actually enter Thompson's cell to check her.

60.     At approximately 8:40 PM, Puckett tells Fluhr that Thompson needs to be checked.

61.     At approximately 8:57 PM, seventeen minutes after being told by Puckett, Fluhr enters Thompson's cell and Morton enters with her.

62.     Fluhr found Thompson not snoring, pale, cold and non-responsive.

63.     Fluhr called for an ambulance and she and Mr. Morton began CPR.

64.     Paramedics took over resuscitation efforts and transported her to Harrison County Hospital.   They noted she was not breathing, had no pulse, was unresponsive and had a small amount of blood-tinged liquid on her face and bed.

65.     Thompson arrived at Harrison County Hospital in full cardiac arrest.

66.     Thompson was pronounced dead at Harrison County Hospital shortly after her arrival.

## OFFICIAL POLICIES AND/OR CUSTOMS THAT CONTRIBUTED TO AND/OR CAUSED CRYSTAL'S DEATH

67.     Plaintiffs assert and re-allege each and every above paragraph as if included herein.

68.     Numerous official policies, customs and/or widespread practices that were so well-settled that they amounted to policy were implemented or should have been but were not

implemented by the Harrison County Jail, Defendants Deatrick, Mabon and Mr. Morton, and continue to be implemented by Defendant Seelye.

69.     In concert with Defendant Advanced, Deatrick and/or Mabon implemented a policy that prevented employees, deputies and/or officers from calling for emergency medical services without first getting approval from Dr. Al-Shami or other Advanced employees.

70.     This policy directly contributed to, caused and/or was a substantial factor in causing Crystal's death because when Crystal showed numerous signs of unresponsiveness, emergency medical personnel should have been called and/or the officers, deputies and/or employees should have transported her to a hospital.

71.     This policy directly contributed to, caused and/or was a substantial factor in causing Crystal's death because unresponsive individuals should be seen, in person, by trained medical professionals and because Dr. Al-Shami was not located at the jail, this policy evidenced a substantial risk to Crystal and other detainees, inmates or prisoners of serious physical danger up to and including death.

72.     This policy evidences a deliberate indifference to the life, health, safety and constitutional rights of inmates, detainees and prisoners and, specifically, evidenced a deliberate indifference to the life, health, safety and constitutional rights of Crystal Thompson.

73.     Additionally, the Harrison County Jail, Defendants Deatrick, Mabon and Mr. Morton individually and in their official capacity all failed to train, supervise and/or implement medical observation policies and emergency medical care procedures as required by 210 IAC 3-1-11.

74.     Defendants Deatrick, Mabon and Mr. Morton all knew that employees of the jail would confront situations involving injured, sick or unresponsive inmates, detainees and/or

prisoners.  When confronted with such a situation, the employees of the jail faced a difficult choice about how to care for, provide medical assistance to or seek professional medical help for an inmate, prisoner and/or detainee.

75.     With proper training about the need for immediate, emergency medical attention to assist an unresponsive person (including a person who cannot remain awake, does not wake up despite a sternum rub, an ammonia swab, close-range yelling, tapping shoulders, arms and legs that drop when lifted and easily-opened eyelids that produce only the whites of a person's eyes), the employees would face a less difficult choice about whether to leave the person laying unresponsive without checking them for four hours on the advice of a medical professional reached via phone for a 3 minute call or immediately send the person directly to the hospital.

76.     When employees of the jail make the wrong choice in that situation, it will frequently and, in this case, did, cause the deprivation of the person's constitutional rights, including allowing the person to slowly die alone in a jail cell, on video.

77.     Additionally, the Harrison County Jail, Defendants Deatrick, Mabon and Mr. Morton individually and in their official capacity all failed to implement, train, supervise and/or monitor the employees of the jail in regular cell checks as required by 210 IAC 3-1-14.

78.     Finally, the Harrison County Jail, Defendants Deatrick, Mabon and Mr. Morton individually and in their official capacity all failed to implement, train, supervise and/or monitor the employees of the jail in the classification of detainees, prisoners and/or inmate's medical needs and observation criteria, how often and in what manner someone on "med watch" needed to be checked, how often and in what manner someone on "medical observation" needed to be checked, how to pass the classification on to a later shift and how to determine which classification a person required.

79.     Defendants Deatrick, Mabon and Mr. Morton all knew that employees of the jail would confront situations involving injured, sick or unresponsive inmates, detainees and/or prisoners.  When confronted with such a situation, the employees of the jail faced a difficult choice about how to care for, classify, monitor, pass on information, provide medical assistance to or seek professional medical help for an inmate, prisoner and/or detainee.

80.     With proper training about how to care for, classify, monitor, pass on information, provide medical assistance to or seek professional medical help for a detainee, prisoner or inmate, the manner and frequency during which to check an individual and how to ensure the information is passed onto a later shift, the employees would face a less difficult choice about how to monitor such persons.  The consequences of making the wrong choice, including the death and deprivation of constitutional rights of the person, can be avoided with proper training.

81.     Accordingly, the Harrison County Jail, Harrison County Government, Deatrick, Mabin and Mr. Morton, as well as any other individual defendant with supervisory, policy-making, training and/or policy-implementation authority, the identity of such defendant which can only be learned through a reasonable discovery process, are liable in their Official Capacity for any and all damages their official policy, custom and/or failure to implement and/or train caused to Plaintiffs.

### COUNT ONE: VIOLATIONS OF CRYSTAL THOMPSON'S CIVIL RIGHTS PURSUANT TO § 1983

82.     Plaintiffs assert and re-allege each and every above paragraph as if included herein.

83.     Each and every Defendant, individually, in their Official Capacities, by and through their employees, agents, representatives and/or ostensible agents acted under the color of

state law to deprive Crystal Thompson of her constitutionally-protected rights under the Fourth,

Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

84.    Each and every Defendant individually, in their Official Capacities, by and

through their employees, agents, representatives and/or ostensible agents acted intentionally,

with reckless indifference, deliberately, willfully, wantonly and with a reckless disregard for

Crystal Thompson's life, rights, health, safety and the risk of harm to her.

85.    Plaintiffs believe, and, after reasonable discovery, will show that the Defendants'

treatment of Crystal (individually, in their Official Capacities, by and through their employees,

agents, representatives and/or ostensible agents) was not unusual, but was part of a continuing

pattern of willfully and deliberately ignoring the medical needs of inmates, detainees and/or

prisoners at the jail.  Such conduct is the result of customs, practices written policies, customs

and systematic directions and orders of policy-makers of the Harrison County Jail and Harrison

County, Indiana.  Such practices, policies and failures to act described in detail above evidence a

total, intentional, deliberate and unreasonable disregard for and indifference to the lives and

constitutional and common law rights of inmates, detainees and prisoners at the jail, including

Crystal Thompson, and the wholesale violations of those rights are caused by the regular and

systemic pursuit or failure to pursue such practices.

86.    By being left in her cell for hours, unresponsive and without access to emergency

medical care, Crystal was incarcerated under conditions posing a substantial risk of serious harm.

87.    The Defendants, by failing to provide emergency medical care and failing to

regularly check on, monitor or otherwise examine Crystal acted with a deliberate indifference to

and disregard of the risks posed to Crystal.

88.     The Defendants had actual knowledge that failing to provide medical care to an unresponsive person on narcotics, sleep aids, prescription drugs and/or snoring while overweight posed a serious risk of damage to her future health and a risk so great that it was almost certain to materialize if nothing was done.

89.     The Defendants had a duty to provide adequate medical care to Crystal.

90.     The Defendants knew that unresponsiveness after being found with narcotics, admitting to taking a sleep aid, continuously falling asleep in the middle of the day while standing, talking on the phone or sitting up in her bed all evidenced a serious risk to Crystal's health, life and medical safety.

91.     It was evident to a lay person that Crystal was receiving inadequate or inappropriate treatment.  The risk of her death was obvious.

92.     Defendants ignored the serious risks to Crystal's health and knew there was a high probability, approaching certainty, that an unresponsive person would suffer serious physical harm or death if left alone, untreated and unexamined, without moving, for hours.

93.     Dr. Al-Shami made an erroneous treatment decision that was made in the absence of professional judgment and was so inadequate that no minimally competent professional would have so responded the same way under those circumstances.

94.     As a direct and proximate result of the foregoing, Crystal Thompson, through Defendants' indifference, gross negligence and intentional and reckless conduct, was subject to cruel and unusual punishment and deprived of her right to counsel, right to be free from self-incrimination and right against unreasonable search and seizure, as well as ultimately her life, without due process of law in violation of the Fourth, Fifth, Sixth, Eighth, Tenth and Fourteenth

Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

95.     As a direct result of the violations described above, Crystal endured pain and suffering, wrongful death, medical expenses, funeral expenses and the loss of power to labor and earn money in an amount to be determined at trial and fully recoverable by the Plaintiff Estate.

96.     As a direct result of the violations described above, Crystal's minor children suffered the loss of love, affection, companionship, consortium and parental relationship of their mother, Crystal Thompson.

## COUNT TWO: NEGLIGENCE

97.     Plaintiffs assert and re-allege each and every above paragraph as if included herein.

98.     Each and every one of the above-named Defendants owed duties of reasonable care to Crystal arising from their custody and control over her, and arising from the attempt to provide medical care through Mabon, Fluhr and Mr. Morton, and arising from the medical care provided by Dr. Al-Shami individually and as Advanced's employee, representative, agent and/or ostensible agent.

99.     Defendants knew or should have known that Crystal's life, health and safety were in danger, placed her in a position where her life, health and safety would be in danger and/or assumed a duty by attempting the medical evaluation and/or medical care of Crystal.

100.     The Defendants failed to conform their conduct to the minimum standard of care required under the circumstances.

101.     The Defendants' failure to meet the minimum standard of care directly and proximately caused and/or was a substantial factor in causing Crystal's death.

17

102.    As a direct and proximate result of the foregoing, Crystal Thompson, through Defendants' indifference, gross negligence and intentional and reckless conduct, was subject to cruel and unusual punishment and deprived of her right to counsel, right to be free from self-incrimination and right against unreasonable search and seizure, as well as ultimately her life, without due process of law in violation of the Fourth, Fifth, Sixth, Eighth, Tenth and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

103.    As a direct result of the violations described above, Crystal endured pain and suffering, wrongful death, medical expenses, funeral expenses and the loss of power to labor and earn money in an amount to be determined at trial and fully recoverable by the Plaintiff Estate.

104.    As a direct result of the violations described above, Crystal's minor children suffered the loss of love, affection, companionship, consortium and parental relationship of their mother, Crystal Thompson.

**COUNT THREE: NEGLIGENT RETENTION, HIRING,
TRAINING AND SUPERVISION OF DR. AL-SHAMI AND MABON
(Against Defendants Harrison County Jail, Harrison County Government,
Deatrick, Mabon and Advanced)**

105.    Plaintiffs assert and re-allege each and every above paragraph as if included herein.

106.    Defendants Advanced, Harrison County Jail, Harrison County Government, Deatrick and Mabon all individually and in their Official Capacities hired, trained, supervised, employed, contracted with or otherwise caused Mabon and Dr. Al-Shami to be the primary medical providers for Crystal Thompson and the other detainees, inmates and/or prisoners of the Harrison County Jail.

107.    Dr. Al-Shami and Mabon were not minimally qualified and repeatedly were complained about by employees, officers, deputies, prisoners, inmates and/or detainees.

108.    For instance, inmate Roger Grant was treated by Dr. Al-Shami from March to July 2010, before Crystal died, and suffered injuries from a failure to properly diagnose and treat him.

109.    Upon information and belief, Defendants all knew or should have known about the repeated complaints, failures and lack of qualifications of Mabon and Dr. Al-Shami.

110.    Defendants failed to take reasonable steps to train, supervise, replace and/or otherwise continued to allow Mabon and/or Dr. Al-Shami to see inmates, prisoners and/or detainees at the jail.

111.    As a direct and proximate result, when Crystal Thompson needed medical care on September 9, 2010, Mabon and/or Dr. Al-Shami were the only available medical professionals.

112.    Their gross negligence and/or deliberate indifference to her emergency medical condition contributed to, caused and/or was a substantial factor in causing her death.

113.    As a direct and proximate result of the foregoing, Crystal Thompson, through Defendants' indifference, gross negligence and intentional and reckless conduct, was subject to cruel and unusual punishment and deprived of her right to counsel, right to be free from self-incrimination and right against unreasonable search and seizure, as well as ultimately her life, without due process of law in violation of the Fourth, Fifth, Sixth, Eighth, Tenth and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

114.     As a direct result of the violations described above, Crystal endured pain and suffering, wrongful death, medical expenses, funeral expenses and the loss of power to labor and earn money in an amount to be determined at trial and fully recoverable by the Plaintiff Estate.

115.     As a direct result of the violations described above, Crystal's minor children suffered the loss of love, affection, companionship, consortium and parental relationship of their mother, Crystal Thompson.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs request of this Court the following relief against all Defendants, individually, in their official capacities and jointly and severally,

A.     For general damages, including pain and suffering, in an amount to be proven at the time of trial;

B.     For medical, incidental, hospital, psychological care and other expenses, in an amount to be proven at the time of trial;

C.     For loss of earnings and earning capacity, in an amount to be proven at the time of trial;

D.     For loss of parental consortium as provided by law;

E.     For an award of pre-judgment and post-judgment interest as provided by law;

F.     For consequential damages, in an amount to be proven at the time of trial;

G.     For exemplary or punitive damages against Defendants as provided by law;

H.     For funeral and burial expenses and all other wrongful death and survivorship damages as allowed by law;

I.     For an award providing for payment of costs of suit; including attorneys fees as provided by 42 U.S.C. § 1983, et seq.

J.	For such other and further relief as this Court may deem just and proper.

Dated: June 24, 2011	JONES WARD, PLC


s/Jasper D. Ward
Jasper D. Ward
312 S. Fourth Street
6th Floor
Louisville, KY 40202
(502) 882-6000
(502) 587-2007 (facsimile)
*Attorney for Plaintiffs*
*Admitted to S.D. Indiana 2/28/11*
jasper@jonesward.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues which may be tried by a jury.

Dated: June 24, 2011	JONES WARD, PLC


s/Jasper D. Ward
Jasper D. Ward
312 S. Fourth Street
6th Floor
Louisville, KY 40202
(502) 882-6000
(502) 587-2007 (facsimile)
*Attorney for Plaintiffs*
*Admitted to S.D. Indiana 2/28/11*
jasper@jonesward.com